We will hear argument first this morning in Case 2543, Yellen v. the Confederated Tribes and the Consolidated Case. Mr. Garnieri? Mr. Chief Justice, and may it please the Court, our fundamental submission in this case is that in defining Indian Tribe for ISTA purposes, Congress did not deliberately include Alaska Native Regional and Village Corporations, only to then exclude all of them by subjecting them to a formal political recognition requirement that no ANC meets or indeed has ever met. Instead, the settled understanding for the last 45 years has been that ANCs are eligible to be treated as Indian Tribes for ISTA purposes, even though ANCs are not and have never been federally recognized Indian Tribes. That interpretation has been endorsed by all three branches of the federal government. Congress was acting against the backdrop of those settled understandings when it incorporated the ISTA definition of Indian Tribe into the CARES Act in 2020. Congress chose to make ANCs eligible to receive millions of dollars of coronavirus relief funds to benefit the many Alaska Natives whom they serve. The decision below contravenes that policy judgment and threatens to shut ANCs out of a wide range of important federal programs. No sound principle of textual interpretation justifies such a dramatic departure from the status quo. Reading the ISTA definition to mean that ANCs are included only in the event that they are someday somehow recognized by the United States for government-to-government relations would render their deliberate inclusion in the statute a dead letter. Either the recognition clause must mean something else or it does not apply to ANCs. Now, we principally urge the latter approach, which the Department of the Interior and the Indian Health Service adopted decades ago and which the Ninth Circuit endorsed in the Cook Inlet case. In our view, Congress defined the entities eligible to enter into ISTA agreements as federally recognized Indian Tribes and also, in addition, the entities that play a similar role in the special case of Alaska, namely Alaska Native villages and Alaska Native corporations defined in an established pursuant to ANCSA. That reading, unlike respondents' reading, gives effect to every word and clause in the statute. I welcome the Court's questions. Counsel, as I think you confirmed in this opening statement, you rely heavily on the legislative history, the congressional purpose, the post-enactment history, and there was a time when this Court also relied on those sources, but this is not that time. What is the best case you can cite from recent years for your general approach? Well, I think the case that we find the most instructive is the Court's decision, again, in the United States against Hays, which is the case discussed in our opening brief. In Hays, the Court was considering a statutory definition of the term misdemeanor, domestic misdemeanor violence, or, sorry, misdemeanor crime of domestic violence, and the statutory definition there had a prefatory clause and then two subsections, and the question before the Court was how to apply a modifier in the second subsection, and based on textual and contextual evidence, the Court concluded that the modifier that appeared in the second subclause of that definition actually applied to its antecedent, was one of the words in the prefatory clause at the beginning of the definition, and we think we're asking the Court here for an even less sort of, you know, the interpretation that we're urging here is even more naturally sort of derived from the text and the interpretation the Court adopted in Hays, and also, you know, to your point, Mr. Chief Justice, I mean, we are making a textual argument. It's not entirely purposive, and it's a textual argument derived from ISTA's definition as well as from the other statute that Congress has enacted that in their text presupposed that ANCs are eligible to be treated as Indian tribes. Thank you, Counselor. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, would you give us, again, would you repeat, maybe I missed it, your textual argument again? It seems like the ... It seems, I don't know how you cannot have the phrase or clause at the end of the entire list. Well, Justice Thomas, the textual argument is that if you look at the definition of ISTA should not be read to include ANCs in a ... Congress did not deliberately and specifically refer to Alaska Native Village and Regional Corporations established pursuant to a then-recent federal law only to exclude them in the very next clause. We don't think the statute should be read to be at war with itself. Yeah, but what do you do with the recognized language? Well, we think that that clause that the Interior Department concluded in 1976, shortly after ISTA was enacted, we think that clause is simply inapplicable to the entities listed in the Alaska clause, and that that's really the only reading or the reading of a statute that would avoid the glaring superfluity problem that the D.C. Circuit's reading created. Now, of course, as an alternative, we have also advanced in this court the argument that if you understand the recognition clause to apply to the entities listed in the Alaska clause, then recognition cannot refer exclusively to formal federal recognition for government to government relation, but must also include the lesser form of recognition that Congress itself bestowed upon ANCs by including them in the ISTA definition. In the subsequent funding bills, is Congress recognizing that there's been this litigation? Has Congress used different language? Congress has gone both ways on that issue, Justice Thomas. I mean, in the law that Congress enacted, I assume your question is about the recent coronavirus legislation? Exactly. Well, in the law that Congress enacted in December of 2020, Congress provided funds for housing programs under a pre-existing federal statute that incorporates in part the ISTA language, and Congress included a proviso there saying that for the avoidance of doubt, that definition includes ANCs. Now, in the most recent law, the America Rescue Plan Act, Congress provided additional funds, coronavirus relief funds, to state and local governments and to tribal governments using the List Act definition, which excludes ANCs, so Congress determined not to include ANCs in that program. And of course, Congress could have done that in the CARES Act. It could have reached for the List Act definition, which everyone understands does not include ANCs, but Congress instead used the ISTA definition, which has been uniformly understood for decades to make ANCs eligible. Thank you. Justice Breyer? I'm just curious as to whether, what CARES Act expenditures, you know, necessary related to COVID, et cetera, do the Alaska corporations make that kind of expenditure? Are there examples of where they did or would normally or where it was necessary, in other words, necessaries in the CARES Act? Yes, Your Honor, I think that the amicus brief filed by Cook Inland Region Incorporated, which is the regional ANC in the Alaska area, goes into that in some detail. I mean, ANCs provide social services to their members, and in the course of doing so, they have and can incur necessary expenditures in response to the pandemic, things like the Okay, I see that. What's actually bothering me here is I gather there are roughly 150 statutes that definitionally refer to the statute of issue here. Is it the ISCA? That's the statute, right? That has the definition. Okay. I don't know what's in that 150 statutes. I suspect that some of them, it makes sense to apply to the corporations, the Alaska Indian corporations, and some it doesn't. So, I have a very hard time. Have you been through those? Do we know that the view that you're taking now is going to work in all those 150 statutes? Well, Justice Breyer, we have reviewed those statutes, and I agree that the ISCA definition is quite frequently, it quite frequently appears in the U.S. Code. Either by cross-reference or by Congress having used the same language. Now, as we discussed at pages 33 to 34 of our brief, there are statutes in which there are other textual and contextual clues that indicate that either ANCs are not included for other reasons, or ANCs, the programs are sort of inapplicable to ANCs. Yeah. So, I don't, you know, we How do you do that? I mean, that's what I can't quite figure out, because there's an argument, you know, that even if the ISCA applies, the CARES Act doesn't apply. But, I don't see, once you say the ISCA, once that definition applies, and it's a statute that really doesn't make sense to put this kind of corporation in it, how do you read him out of it? Well, I think in general it's a separate analysis for each statute. I think, you know, one of the most persuasive pieces of textual evidence is, of course, there are instances in which Congress has used the ISTA definition, and then has expressly excluded the native village. Yeah, yeah, yeah, I can see that. That really only makes sense if Congress understands the ISTA definition to include ANCs. So, that's, now you've got me where, thank you, that's really helpful. Cicillito? Mr. Guarnieri, I think you have an absurdity argument, and I'll ask respondents' counsel about that, but if you can't prevail on that basis, I can see one textual argument that could possibly work for you, and you make it only in passing, and that is that the clause which is recognized as eligible doesn't mean formal recognition in the sense in which Indian tribes are recognized. Do you have any other textual argument? Well, yes, Justice Alito. Well, first, we would accept a decision by that court on that alternative ground, but, I mean, as to our principal argument, I think the textual argument is that the word included here functions as a term of enlargement rather than to denote a subset of the specified entities. Yeah, no, I understand that point, and I think that's possible. I don't see how it helps you, because you still have a clause modifying a list, and you want it to jump over the last item in the list. That's really odd, isn't it? I take the point. Let me try a plain English example to illustrate how we think the definition works here. I mean, suppose a state were to prioritize for vaccinations all doctors, nurses, and other health care workers, including their spouses and minor children, whose jobs require frequent contact with the public. Now, I think in context, one would naturally understand that the final clause in that, the clause referring to jobs requiring frequent contact with the public, really only modifies and in context can only be understood to modify the doctors, nurses, and other health care workers who appear in the list at the beginning. And then there's just an including clause stuck in the middle there, and perhaps not the most elegant place, but in a place that makes clear that the intent is to expand that category of, you know, frontline workers to also include their families and minor children. And that's what Congress did in the IFTA definition. The definition is best read to refer to federally recognized Indian tribes. And then also including, in addition, the specific Alaska Native Village and Regional Corporations that Congress singled out for inclusion in an Alaska-specific clause. All right. Well, that's very close to what I referred to as the absurdity argument. If we were to take the other possible textual approach and say that recognize doesn't mean formal recognition, what effect would that have in other statutes that use this same definition? Would you be willing to accept that, or would you want us to say this is what it means only in the CARES Act and not in the other statutes in which the same definition is used? Well, Justice Alito, I think our alternative argument is slightly different. I mean, I think we would say that recognition on the alternative argument, recognition doesn't refer exclusively to federal recognition for government-to-government relations, but can also refer to the lesser status that Congress conferred on ANCs. And there's a reason I would emphasize that distinction, and it's that, you know, I mean, IFTA contracting is not entirely discretionary, and so we do have some concern that other organized groups of Indians who are not federally recognized Indian tribes would be coming in and demanding that the Interior Department engage in IFTA contracting with them. All right. Thank you, Counsel. My time is up. Justice Sotomayor. Counsel, I'm a bit concerned the way Justice Breyer is about what our ruling would mean here, and it's consistent in part with what Justice Alito has just asked you, which is how do we rule in a narrow way that affects only the CARES Act and not the many other acts that are involved? For ISTA mentioned the Johnson O'Malley Act, the Schneider Act, which I think is now the I believe, and you can confirm or disaffirm, that there are many other housing assistance, health care, and social service to thousands of Alaskan Natives each year by the ANCs. Would our, if we were to accept respondents' position and the D.C. Circuit's holding below that ISTA does not, cannot include anyone but federally recognized tribes, would we be putting at risk all of those other services? Well, yes. And if so, is the federal government prepared to step in and provide those services? Well, that's exactly right, Justice Sotomayor. A decision affirming the D.C. Circuit here and adopting respondents' construction would call into question the treatment of ANCs under numerous other federal laws that currently provide important federal benefits to Alaska Natives, including housing assistance and energy assistance. And to your broader point, Justice Sotomayor, the interpretation that we are propounding here is the interpretation that has prevailed for 45 years and that was the backdrop for Congress' enactment of numerous other programs incorporating the ISTA language. And so a decision in respondents' favor would threaten to really seriously disrupt the federal law. Okay. So, counsel, give us the narrowest ruling that would let respondents win and not put those contracts at risk. Well, of course, Justice Sotomayor, we think that respondents should not win. I mean, we are here... I respect that, counsel. I'm asking you to tell me. Sure. Sure. I take the point. Well, as between the arguments offered on the other side, a decision finding that ANCs are excluded from receiving CARES Act funds by some specific language in the CARES Act, for example, the definition of a tribal government in the CARES Act, would mean that ANCs are ineligible to receive these particular CARES Act funds but would not necessarily call into their question their eligibility to be treated as Indian tribes for ISTA purposes under the Indian laws. So certainly a CARES Act-specific decision would be a much more narrower ground. The D.C. Circuit here really decided the case on the broadest possible ground. I mean, in this CARES Act dispute, the D.C. Circuit concluded that ANCs have never been eligible to be treated as Indian tribes for ISTA purposes despite decades of practice to the contrary. Justice Kagan? Mr. Guarnieri, would it be fair to say that your textual argument really isn't a textual argument? It's an argument that Congress just made a mistake. Justice Kagan, I'm not going to sit here and say that this is the best possible way to draft the statute of all of the possible… Well, I think we can all agree on that. I mean, the question is… I mean, you're saying, look, they wouldn't have put something in just to take something out. I understand that. But there's just no grammatical way to read this statute the way you want to read it. No grammatical way, which isn't to say that that's not what Congress intended. I mean, I would have thought that what you're really saying is Congress made a bad grammatical error, but we know what they meant. I think that's a fair characterization, Justice Kagan. I mean, in Hays, the decision that I referred to earlier in my colloquy with the Chief Justice, the court described the statute as less than meticulously drafted, and I think we're probably in that category here. But as you said, I mean, I think it's fairly clear what the meaning of this statute was, and that's why… Then the question becomes, is it? You know, because I think it's a high bar. Before, we're so confident that Congress made a mistake that we just say we think Congress made a mistake, but they meant something else. And that comes to this question of could they have meant what they appear to mean if you just look at the text, which is that they included the ANCs so that if those ANCs were recognized in the future, they would qualify. Well, there's just absolutely no hint in the history of ISTA that Congress understood ANCs to be included only on the condition that Congress itself in the future were to somehow decide to recognize for government-to-government relations these recently established and established corporations. I just don't think that that's a… It's a contextually implausible result. But wasn't there, Mr. Guarnieri, some uncertainty at the time about what kinds of Alaskan groups would be recognized? I mean, we often say that Alaska is different, and that seems to be the case here, that the government had recognized Native groups without traditional historic bonds. ANCs would have resembled tribes in that they owned land. I mean, we just have sort of different groups here. And why might Congress not have thought, well, we'll see how it all plays out, and maybe one day, given the circumstances of Alaska, these groups will be recognized? Well, Justice Kagan, the principle consideration going the other way is that for 180 years, one of the core elements of the United States Indian law has been the idea that Indian tribes are possessed of an inherent sovereignty, a sovereignty that is not conferred on them by federal or state law. And that is simply not true for ANCs, and it has never been true, and it would have been apparent to the Congress at the time it enacted ISTA that it was not true. ANCs were established pursuant to a special federal law. They are incorporated under state law, and they are not sovereign entities, and that was evident to everyone at the time. Thank you. Justice Gorsuch? Good morning, counsel. Putting aside what has been called the absurdity argument, and just focusing on the last clause of the text, the recognition clause, and assuming that that means something and applies to ANCs, the D.C. Circuit suggested that that's a subtle term of art, and it refers to government-to-government relations. What's your response to that argument? Well, in the lower courts, we also advocated that the recognition clause should be understood to refer to recognition in a formal term of art sense, and that's an important premise for our main argument, which is that the clause, as a matter of context, really cannot be read to include the ANCs. Now, in this court, we have also— So am I right in understanding that you think it is a term of art, and that it does refer to government-to-government relations? Yes, Justice, and certainly language like that has come to be understood as a term of art. It's less clear to us that that would have been apparent to Congress in 1975 when it enacted ISTA. I mean, the precise language at issue here, recognized as eligible, that phrase was not common. It had appeared in perhaps a handful of statutes prior to ISTA, but there was no sort of long and detailed— You've got no better solution than to agree that it's a formal term of art referring to government-to-government relations. Well, that's the way that the executive branches understood it in practice for the last several decades, and we have also understood it not to apply to ANCs. That's the settled construction, and it was the settled construction when Congress incorporated the meaning of ISTA into the CARES Act in 2020. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Guarnieri. I just want to follow up on Justice Gorsuch's questions there. I read your alternative argument in the brief, Tad, to say that you agree with the other petitioner that we shouldn't read it as a term of art. So I'm a little confused about what your argument is. Well, Justice Kavanaugh, it's an argument in the alternative. I mean, our principal argument is that the recognition clause refers to recognition as a term of art or formal—the establishment and institutionalization of formal government-to-government relations, and that's why it cannot be read to apply to the ANCs because there's simply no sound basis to think that Congress had in mind that ANCs would be included only in the event that they were somehow in the future recognized for government-to-government relations. Now, in the alternative, if the court disagrees with us on that point, then we would argue that a reasonable and certainly a reading that is available to the court is that the recognition clause applies to the ANCs, but that it doesn't refer exclusively to recognition in that term of art sense. Both of those constructions would be far better than the D.C. Circuit's constructions, which To pick up on questions I think Justice Breyer, Justice Alito, and Justice Sotomayor were asking about the implications for other statutes, we have a number of amicus briefs saying, for example, the brief of the senators and congressmen saying the potential ramifications would be staggering if your position would not prevail. The Cook Inlet one says it would destabilize the entire tribal health and social services system in Alaska. The brief of the Alaska Federation of Natives says similar things. Do you agree with that or not? We do agree with that. We have grave concerns about what the effects of affirming the D.C. Circuit's position here would be on a wide range of other federal programs. Now, as a matter of practice, there are relatively few ISTA agreements currently in force other than the ISTA agreement that the Cook Inlet Region Incorporated, the ANC for the Anchorage area, has to deliver federally funded health care services to Alaska Natives in Anchorage. With respect to that specific ISTA agreement, Congress enacted a statute that arguably provides a statutory basis for that separate and apart from ISTA. So we're not entirely sure what the effect of a decision would be on series arrangements, but certainly we are gravely concerned about the destabilizing effect of disrupting what has been the status quo for a very long time. One last question. How much money is exactly at stake and what will happen to it if you lose? Initially, the Department of Treasury allocated about 6% of this $8 billion fund to the ANCs, which is about $530 million. But as a result of separate litigation, there are proceedings ongoing in district court in DDC right now. As a result of those proceedings, the Treasury is currently in the process of reconsidering the methodology it used to distribute at least a portion of these funds, and that could impact the amount of funds available to go to the ANCs. Thank you. Justice Barrett? Good morning, Mr. Guarnieri. I want to go back to the eligibility clause. So you told several of my colleagues that the recognition clause, that one way to understand it is that it's a term of art, but that it has a – well, that you can take its ordinary meaning simply, you know, an entity that contracts with the federal government for services that are designed to go to Indians because of their status as Indians. And you said, well, sure, you can look at this and I understand it's your backup argument, but you can understand it in its ordinary meaning as the other petitioner advocates for. And then you say, but a lesser included definition would be the term of art recognition definition like we see in the Later Past List Act. I don't really see how you can have a lesser included specialized definition. It seems to me either it's ordinary meaning or it's not, and you're kind of cagey in your little bit at oral argument too about whether in fact that eligibility clause refers to FRT status. So which is it? I mean, is this the first time that the government has taken the position that language like this doesn't refer to FRT status? I guess I would put the point this way. I mean, we think that that clause can be reasonably read to refer to having a requisite status under federal law, and then it just applies, you know, different entities would be able to satisfy that requirement in different ways. For the ANCs, Congress deems them to satisfy it by specifically including them among the entities that are eligible to enter into ISTA agreements. For the generic terms listed at the beginning of the statute, that is any Indian tribe, band, nation, or other organized group or community. I mean, the established way for those groups to demonstrate that they have the requisite status is to be acknowledged for government-to-government relations with the United States. But let me just ask you, that sounds like you're folding back into your argument about, well, specific mention of the Alaskan entities would have not made any sense if the eligibility clause was designed to apply to them because ANCs by their very composition have, you know, they were designed to channel money from the federal government to their shareholders, and so they had that status from the beginning. So what I'm asking you is a little bit different because if the ordinary meaning, say, of that eligibility clause prevails, then we don't have to – we could rule in your favor without doing this kind of fancy footwork around the awkward grammatical reading of the statute. You don't really seem to be endorsing that. Well, we would entirely accept a decision on those grounds, and I don't mean to be dancing around it. Our concern is that, in general, we would hope to preserve the ability to ensure that if the agreements are entered into with tribes or federally recognized tribes that have a kind of recognized status under federal law and not simply groups that self-identified Indians who come to the Interior Department and demand to take over the delivery of federally funded services. That's why it's important to us as a programmatic matter that, in general, the way that Indian tribes demonstrate that they have the requisite status is through the acknowledgement process. Do you have a minute to wrap up, Counsel? Thank you, Mr. Chief Justice. I would just like to emphasize again a couple of the points that I touched on this morning. First, if this definition of Indian tribe should not be read to be at war with itself, Congress did not deliberately and specifically include ANCs in one clause only to, again, exclude them in the very next clause. Now, our principal argument is that recognition, if understood as a term of art in the clause, should not apply to ANCs, but we would accept the decision under which recognition is given somewhat more capacious meaning, and the ANCs satisfy that. Second, I just want to emphasize again that the question presented here arises under the CARES Act, which Congress enacted in 2020. And by that time, there can be no real question that the IFTA definition was uniformly understood to include ANCs, even though they are not federally recognized Indian tribes. That was the administrative construction. It was the Ninth Circuit's construction in the Cook Inlet case. The construction articulated in all of the leading treatises in this area. That's the meaning Congress incorporated, and that's the meaning we ask this Court to endorse. Thank you, Mr. Chief Justice. Thank you, Counsel. Mr. Clement? Mr. Chief Justice, and may it please the Court, nearly everything about Alaska is different, including its Native entities. Congress established ANCs in the Settlement Act as Native entities, unlike lower 48 tribes. ANCs have never been sovereign, but they have always played a critical role in distributing special federal Indian benefits to Alaska Natives. Congress specifically added ANCs to USDA's definition of Indian tribes. Respondents, however, contend that Congress accomplished nothing because ANCs do not satisfy the eligibility clause. But if that clause is only given its ordinary meaning, ANCs plainly satisfy it. Congress said recognized as eligible, not recognized as sovereigns, and ANCs have long been recognized as eligible for special federal Indian benefits, starting with the Settlement Act. If instead the phrase is given a term of art meaning restricted to sovereign tribes, then it is wholly inapplicable to entities established by Congress as alternatives to sovereign tribes. Either reading is vastly preferable to one that would defeat the ANCs' specific inclusion in the definition. Thank you, Counsel. In your brief, you compare the statute to the case of a caretaker being told to feed the cats, the dogs, and goldfish, which are barking. But the force of that analogy comes from the fact that it's impossible for the goldfish to bark. But in this case, though, Congress has the authority, right, to formally recognize the ANCs, and so doesn't that undermine your analogy? I don't think so, Your Honor, because you're right to say that Congress could, in a subsequent act, recognize the ANCs, but that would be a complete departure both from the nature of ANCs and the nature of sovereign recognition. But you do agree that they have that authority. Congress has the authority to recognize them. In other words, this goldfish can bark. Well, only essentially if Congress passed a statute that says that when goldfish move their lips, we are going to construe that to be barking, which is to say it really is impossible, based on any understanding of the nature of either ANCs or sovereign recognition, to say that the ANCs would be recognized as trapped. If I end up where Judge Henderson did and say that the purpose is clear, but the text is also clear, how do I come out the other way? How do you resolve that conflict? Well, I think the way to resolve that conflict, the easiest way, is to give the eligibility clause its ordinary meaning. It says recognized as eligible. It doesn't say recognized as sovereign. Now, those may be the same thing in the lower 48, but they're very different in Alaska because of the Settlement Act. And so I think that's the way you give meaning to every word in the statute and also honor Congress's evident intent both in 1975 and in 2020. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Clement, just some clarification. What's the overlap between the ANCs and the 200-plus tribes in Alaska? Well, I guess one way to answer that, Justice Thomas, is there's an overlap between the village-level ANCs and the villages. But where there is not an overlap is between the membership and the shareholders of the regional ANCs and the villages. And if you look at just the Anchorage area alone, you're talking about 54,000 Alaskan Natives who get benefits from CERI who are not a member of one of the Anchorage-area villages, which aren't actually in Anchorage. They're just in the surrounding region. All right, so are most of the shareholders of the corporations, the ANCs, are they also members of tribes, too? Or are there non-tribal members who are non-tribal individuals who are shareholders? There are many, many, tens of thousands, Alaskan Natives who are shareholders of an ANC but not enrolled members of any village-type tribe. So there's a substantial number of that. Of course, there is some overlap. But once you find that both entities are eligible, there are various ways that it's relatively easy to avoid double-counting. And how would you do that? You would just make adjustments for overlapping membership. You can also, for some formulas, you use things different other than population. So there's a variety of ways that the Treasury Department actually did it in this very distribution of funds. And more generally, the federal government has found a way to make this work because what you really do is you do have identifiable Native populations, not just in Anchorage but in Fairbanks and Seward and Valdez, who are not served by any village but are served by the regional ANC. And those Alaskan Natives will go radically underserved if the ANCs are cut out of the statute. What do you make of the fact that, at least as I understand it, there were no changes made to address the confusion that we have or the controversy we have in this case in the American Rescue Plan Act? Well, I think, Justice Thomas, what's going on there is that essentially Congress didn't want to prefigure how this court would decide this case. So when Congress wanted to include the federally recognized tribes only, it used the LISC Act definition. And when it wanted to include the ANCs, it specified that they were included. But I would say that the understanding from 1975 through the reenactment in 1988 was that the gold standard for including ANCs in the statute was to use the USDA definition. Justice Breyer? With your other argument, you said, well, they're eligible. They're eligible. Mine, that would get us out of this problem. But I'm worried about the other 150 statutes. Have you looked at those? That kind of definition wouldn't cause a problem somewhere else? I have looked at those definitions, Justice Breyer. And I don't think it would create a problem in those other statutes. And I guess what I would say is I think the situation is asymmetrical. There are a couple of statutes, and respondents point to them, that seem to include the ANCs in the statute that is otherwise addressed to some sovereign's function that the ANCs really don't discharge. And that modest degree of over-inclusion is really harmless error because they just don't participate in the program. Conversely, there are plenty of statutes that embody the ISDA definition and are plainly involved ANCs and have since their inception. And as the federal government points out in its brief, just in fiscal year 2020 alone, the ANCs received $40 million in housing assistance pursuant to the HOSDA, which basically incorporates the definition from ISDIA. So I think the impact on other statutes is completely asymmetric. If the ANCs fall out because they don't provide the particular program, no harm, no foul. If instead they are cut out of programs they participated in for decades, there are going to be tens of thousands of Alaskan natives who don't get benefits that Congress plainly intended that they would receive, not just in the abstract, but through ANC. Thank you. Justice Alito? Is there a difference between your interpretation of the Recognition Clause and the Solicitor General's interpretation? And if there is a difference, what do you understand it to be? I don't think there is a difference, Justice Alito. I think, as you can see from this morning's argument, though, the principle difference is I want to leap to the ordinary language argument, and my friend from the government seems to only want to get sort of edged there. But, you know, I don't think the other side can really have it both ways. You're either a textualist or you're not. And if you're a textualist, why wouldn't you apply the plain meaning of recognized as eligible? Congress said recognized as eligible, not recognized as sovereign. Those may be interchangeable in the lower 48, but they're very different terms in Alaska. And that all goes back to the Settlement Act. Congress didn't want to replicate the lower 48 of sovereign tribes moored to reservations when they distributed the benefits of the land settlement. So they created these new entities that were distinctly Native entities. They caused every Alaskan Native to enroll in one of the regional ANCs. They didn't require them to enroll in a village. And then four years later, Congress said, in a process of furthering self-determination, we want to include the ANCs. It would be bizarre to cut them out on the understanding that what Congress really wanted is not to have ANCs play a role in self-determination, but only allow sovereign entities to play a role in self-determination when Congress just rejected that judgment in Alaska. Let me add, I'd like you to see if I'm correct on these two points. The CARE Act provided a one-time distribution of funds. At the time when the CARE Act was enacted, no ANC had been recognized. Recognized as sovereign. I would say they had been recognized as eligible for special settlement benefits. None had been recognized in the sense that the D.C. Circuit thought was necessary. Are those two points correct? Those two points are crystal clear. Thank you. Justice Sotomayor? I'm a bit confused, Mr. Clement. What do you see recognized as eligible to mean? So I see recognized as eligible to mean recognized by the federal government as eligible to participate in special federal Indian programs. And like you said, in the lower 48, recognition and sovereignty go together. But in Alaska in particular, they sort of split that atom and they created these entities, the ANCs, that are eligible to participate in special federal Indian programs, but they were never understood to be sovereign. And so I think if you recognize that Alaska is different in this regard, then I think that really solves the problem here. I don't disagree with you. I think that it would make no sense to think that ISDA was based on political recognition, but let's get to the CARES Act, okay? How would I see that as relevant to saying that you were recognized to receive money that was being given to governments when ANCs are not governments? Oh, I think that's relatively straightforward, Your Honor, because, yes, the money is being given to tribal governments, but tribal governments is just the recognized governing body of a tribe as defined in ISDA. And since ANCs are ISDA tribes and they clearly have recognized governing bodies, there really isn't any statutory problem there. And if it helps, I would point you to two other statutes, 40 U.S.C. 502C3, 44 U.S.C. 36018, which are statutes that have a statutory term of tribal government and expressly include ANCs in the definition of tribal government. Somewhat ironically, they include ANCs but not the villages in a definition that is specifically directed to tribal governments. So the CARES Act would not be alone including ANCs in the definition of tribal governments. Thank you, counsel. Justice Kagan? Mr. Clement, taking this recognized as eligible meaning, when did ANCs become recognized as eligible? So, Justice Kagan, I think ANCs became recognized as eligible in 1971 in the Settlement Act because if you understand that the Settlement Act is distributing the benefits from an aboriginal land settlement, the traditional thing you would do in that circumstance in the lower 48 is you would give the proceeds to a tribe. But Congress in 1971 understood that Alaska didn't have tribes and reservations the way they did in the lower 48. So they specifically created these entities, the ANCs, to receive the proceeds of the settlement, which I would understand to be special federal Indian benefits. And importantly... I mean, Mr. Clement, for sure that act settled land claims. But what does the settling of land claims have to do with eligibility for benefits writ large? So two things, Your Honor. First of all, they were aboriginal land claims. So right there you know these are distinct native entities to receive distinctly native benefits. But then the second point I would make, and I think this is important to understand, is Alaskan natives were eligible in general for special federal Indian benefits even before the Settlement Act through the Snyder Act. And the Snyder Act is one of the acts that is empowered for self-determination under ISDEA. So in a sense, this all works perfectly together, having just created distinct native entities that every Alaskan native was a member of one of the regional ANCs. Then Congress in 1975 includes those entities in a statute that's all about self-determination with respect to funds that Alaskan natives had already all along, even before 1971, been eligible for. Thank you, Mr. Clement. First is Gorsuch. Good morning, Mr. Clement. It seems to me that the government is a little nervous about moving off of recognition in its formal sense because it's concerned about self-identifying groups declaring their eligibility for a lot of federal programs. And you're a little less concerned about that, understandably. But there are a couple of terms there that just I struggle with. To the extent we're defining a tribal government, that's what the CARES Act is, isn't that an odd fit for a corporate board? Again, Justice Gorsuch, I don't think that it is. And various Indian tribes, and you probably know this better than I do, are organized in various different ways. I'm sure there are lower 48 tribes that have some kind of incorporation and some kind of board. So it's not like you can't have a native entity that is governed by a board of directors, which is a very common, ordinary way of referring to it. And as I alluded to in answering Justice Sotomayor's questions, there's at least two other statutes that specifically include ANCs. Are you aware of other tribal governments organized in this fashion in the lower 48? I can't point you to one in specific. What about the separate phrase, two Indians because of their status as Indians? Again, that seems like an odd fit for the ANCs given that, of course, you can be a member of the corporation without being a native today. A lot of alienation has occurred and is permissible. Well, two things, Your Honor. There hasn't been that much alienation, and anybody who's not a native doesn't get a voting share. They just get a share. But with that minor clarification, obviously that sort of special federal Indian benefits for Indians is a bit of an odd phrase, not just, I think, to ANCs but to any group because it really seems to be talking about the benefits that the Alaskan natives or the lower 48 natives themselves are eligible because their status is Indian. But to the extent entities have a status, nobody doubts that ANCs have a native status. And I think the fact that the real point of the Self-Determination Act is to take natives who are eligible for special federal Indian benefits, and instead of having the federal government provide those directly, you have a tribal entity do that. And in Alaska, the ANCs have been doing that for 45 years, and it's been working exceptionally well. So there's no basis to disturb that. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Collin. I just want to explore briefly your understanding of the term of art canon. Is it your understanding, I think, from what you're saying, that the canon is something of an exception to ordinary meaning? In other words, sometimes you'll look at a phrase or words and say the ordinary meaning is X, but the term of art that we know is Y. Is that your understanding of how it works? That is my understanding, Justice Kavanaugh. And I do think, as your question suggested, that the strong preference is for ordinary meaning, which is the rule, and term of art is the exception. And in a situation like this, where adopting the term of art reading would create a real problem with the statute, that seems like an obvious case to prefer the ordinary meaning. And what's your best argument for why recognize as eligible as ordinary meaning supports your position? Well, I think it's a pretty straightforward argument, Your Honor. I mean, eligibility is not the same as sovereignty. If Congress wanted everything to turn on sovereignty, it would have said recognize as sovereign, or it might have even said eligible via recognition. But it didn't use any of those terms. And one other point I'd like to emphasize is that the term of art argument is much weaker in 1975 than it was after the List Act in 1994. In 1975, as the government's lawyers suggested, recognition is not the well-established term of art that it is. In fact, in 1975, the federal government's recognition process was kind of a mess. And when they tried to regularize it a little bit in 1978 with their first regulations, even those regulations talked about acknowledgement. And even today, the federal government has an Office of Tribal Acknowledgement, not an Office of Tribal Recognition. It's really not until 1994 and the List Act that you can really see recognize as eligible as being a term of art. And even then, it's really only a term of art for the lower 48. So making it a term of art back in 1975 that applies to Alaska that would have the effect of frustrating the inclusion of the Alaska Clause really doesn't make any sense. Thank you. Justice Barrett? Mr. Clement, why wouldn't it make sense? I mean, as you just pointed out, the List Act uses language that's identical to the Eligibility Clause in ISDA. So why, then, aren't ANCs really practically automatically recognized under the List Act? Well, they're not, Your Honor, because if you go into the details of the List Act and you go and look at the note to the definition, it's very clear that what Congress was trying to do in the List Act was to essentially force the Interior Department to formalize its process for sovereign recognition. And the ANCs, just based on any traditional criteria for sovereign recognition, just don't come within the terms of that List Act process. I mean, I understand that, but doesn't Congress' use of that phrase in the List Act undercut your argument that eligibility isn't about sovereignty? No, I don't think so, Your Honor. And I think, again, for two reasons. One is the language is not exactly identical, because whenever Congress has talked about recognition as meaning only sovereignty in subsequent years after 1975, they specifically tethered it to recognition by the Secretary. And I think that brings in the entirety of the process for recognition and its sovereign requirements. And if you go back to 1975, the idea that when Congress was trying to promote self-determination in Alaska, it was going to hinge that on whether the Alaska entities were sovereign doesn't make any sense, even as to the villages. It took 18 years to figure out whether the villages were sovereign. I mean, I can see that, but it's kind of at war with the plain meaning of the text if it's understood to be a term of art. And I mean, I take your point that maybe it wasn't a term of art when ISDA was enacted, but became so later, particularly after the List Act. But can you think of any other instance in statutory interpretation where something has had its ordinary meaning in the beginning and then gained a term of art, where then you interpret statutes differently depending on where they fell along the continuum of that process? It seems to me, I can't point you to that, but I would say two things. One is, if a term only becomes a term of art later, let's say 1994, I don't think you would import it backwards to a statute that was enacted earlier. And I still don't think even in 1994 that recognized as it's used in ISDIA is a term of art. And the best evidence of that is Nahasda, which was passed one year later in 1995, and it basically mimics the ISDIA language, and it has been interpreted from day one to include the ANCs, and they got $40 million of funding under it last year. Thank you, Mr. Clement. A minute to wrap up. Counsel? Thank you, Mr. Chief Justice. In the end, whether the eligibility clause has an ordinary meaning that ANCs satisfy or a term of art meaning that is wholly inapplicable to them, there is no cause for interpreting ISDIA or the CARES Act to exclude ANCs and the natives they serve. Alaskan natives were eligible for special federal Indian benefits long before the Settlement Act in ISDIA. Nothing in either statute terminated those benefits or made them turn on membership in a sovereign tribe. To the contrary, the Settlement Act told every Alaskan native to enroll not in a village, but in a regional ANC. As a direct result of that congressional decision, there are tens of thousands of Alaskan natives whose only native affiliation is with an ANC. Cutting ANCs out of ISDIA's definition would leave those Alaskan natives out in the cold. Cutting out ANCs would also destroy Alaska's self-determination success story that depends on cooperation between ANCs and sovereign villages. In short, Alaska is different and Alaska is working. This court should reverse. Thank you, Counsel. Mr. Rasmussen? Thank you, Mr. Chief Justice, and may it please the court. The unanimous panel of the D.C. Circuit had no difficulty concluding that ANCs do not qualify as Indian tribes under ISDIA and thus under the CARES Act. As court of appeals explained, under basic English sentence construction, the recognition clause unambiguously applies to each of the nouns that precedes it, including each ANC. And by referring to groups recognized as eligible for the special programs available to Indians, the recognition clause plainly refers to the formal recognized status. Indeed, the U.S. agreed with that until this case reached this court. Petitioners contend that the court of appeals interpretation would render this statute's inclusion of ANCs superfluous. This is wrong for two reasons. First, the cardinal rule is the plain meaning, and the English language construction of the sentence is simple and clear. Second, as petitioners do not even contest, the political branches could, both in 1975 and today, have believed that their plenary authority allowed them to recognize ANCs. Therefore, there is no surplusivity problem, nor is the court of appeals interpretation absurd because the Congress could reasonably believe, when enacting ISDIA, that ANCs might be recognized in the future. Petitioners also invoke their doctrine of ratification. That is wrong for three reasons, the primary one being simply that that doctrine does not trump the plain meaning. The ANCs warn that, left standing, the court of appeals decision will deprive Alaska Natives of much-needed services and benefits. In actuality, the opposite is true. Alaska Native villages provide those benefits to Alaska Natives, and the primary example of an ANC doing so, which is Siri, is authorized by an independent statute. The court of appeals decision should be affirmed. I welcome the court's questions. Counsel, your side's fundamental argument is that the text is clear and that that doesn't include, by the time you get to the end of the sentence, it doesn't include the ANCs. But the text itself, in the middle of the clause, does include the ANCs, and then that same clause, under your reading, takes eligibility away from the ANCs. And my question is, why doesn't that text undermine the plain language argument? In other words, we're not talking about some overriding purpose, we're not talking about legislative history. What we're talking about is the text, and the text says, in the list, ANCs. And then the text takes away eligibility, and it seems to me that that text creates ambiguity so that a textual reading isn't a plain reading. What's your answer to that? Well, I think we've got a couple of answers to that, but I think first is that when Congress was acting in 1975, this was completely uncertain. We have from 1971 until 1993 before it became clear. And so there wasn't that certainty, and certainly when Congress was enacting the ISDEA, it did not know. And when Congress doesn't know, this Court has never said, oh, well, you've got to go and figure that out, Congress, and you've got to then come up with the decision now when you enact this statute. Instead, what Congress did here is what it commonly does, which is to provide a series and then a qualifier at the end, and that's to include all of the entities that come before that. And so in our brief to this Court, we discussed that in the very next section of the CARES Act, Congress does exactly that. It refers to cities, towns, parishes that are over 500,000 people. And Congress in that case could have simply looked at a census and said, oh, there's no parish over 500,000. We should take that out. But under the ANC's argument, because it included parishes and then included a qualifier that plainly didn't apply to parishes, all the parishes should have gotten money. So I'm not sure I agree with your argument about the uncertainties. ANCs have never had sovereign authority. They didn't at the time. That was the whole point. This was a revolution in the relationship between the national government and the Native American government. These were not governmental organizations. There was no uncertainty at the time. The whole point was that they were not governmental entities. There was certainly a lot of back and forth on that issue during that period of time. So there were then those attempts. Further, it was also very clear that ANCs could assert and that Congress, under its plenary authority, could say we're going to make ANCs tribes. In fact, that has been proposed on occasion. So there's certainly the possibility that ANCs, even if they didn't qualify at that time, Congress could have enacted something under its plenary power later to say that they were. Whether that would then be permissible would be a separate issue for a later date. Why would Congress put ANCs in the language and then take them out? I mean, is your argument based solely on the uncertainty that at some point in the future, Congress might undo the whole ANCSA approach based on Congress' Alaska's distinct situation? Well, no. Our argument, and perhaps the Chief Justice doesn't agree with it, but we believe that there was substantial uncertainty in 1975. That's certainly what the Court of Appeals found, that there was sufficient uncertainty. When we're dealing with an act of Congress, we don't expect them to be omniscient here. We don't expect them to make that resolution. We expect them to make sure that they cast a wide enough net, and then they use the exclusion clause, the qualification clause at the end, to then eliminate those who wouldn't qualify. And that has the concept that is essential here, and the Alaska Native corporations then don't match that essential concept. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, why do you think the Congress did cross-reference ISDA rather than simply the list of recognized tribes? Well, there are a number of statutes that define Indian tribe that Congress could have incorporated, certainly. Obviously, from the tribe's perspective, we would have rather that they specifically incorporated the List Act, but our view is that after 1993, it's clear that the ISDA really incorporates that concept itself, so that there wasn't a problem. Further, in the CARES Act itself, Congress then references the recognized governing body of an Indian tribe. So, again, it's reiterating that recognition concept in the CARES Act itself, which is why the Ute tribe, the one that I represent primarily, although I'm representing all tribes here today, the Ute tribe views this as something that it would be better to decide this case more narrowly. Mr. Clement made quite a bit of the broader recognition language in the D.C. Circuit's opinion, and he focused more on the language recognized as eligible language. Would you respond to his argument a bit, and what do you think is a refutation of his argument? I think that the primary one is yes. From 1975 to 1993, there was this uncertainty. 1993 makes that crystal clear that the Alaska Native corporations do not qualify under that qualification that is in the List Act, and therefore they do not qualify for the same qualification that is within the ISDA. We know that the United States, until now, has been saying that same exact thing all through this case. Now they've got an alternative argument that is no better, but they've been saying that themselves, that they don't qualify. And what do you make of the ratification argument? Well, ratification, as we view it, there are three main issues, and I alluded to one in my opening, which is simply that ratification, this court's decisions are very clear that ratification simply does not complain meaning. Also, to have ratification, you would have to have something that is well settled and known to Congress, and we don't have that here. In fact, what we have is a lot of things that, in my view, most of the things are on the other side. They can point to one 1976 memo, and then there's a number of other things that point the exact opposite way, so we don't see how they meet any of the three elements for ratification. In your brief, you seem to, and I could be wrong, but you seem to make a distinction between Indian tribes and people of Native American ancestry. What difference would that make, if any? The recognized tribes, the ones that the United States owes the trust duty to, then establish their membership, and that happens in Alaska as well. And so those are the people that have the trust relationship through their tribe with the United States. So when we're talking about trust responsibilities, that's what we're talking about. The ANCs have numerous people who, for whatever reason, are not members of tribes. We agree with Mr. Clement there, but that happens everywhere. There's millions, actually, of people who say they're Native American in the lower 48 who are not members of tribes. That's not an uncommon thing. This Court has always said tribes define their membership, and then the federal recognition establishes the trust responsibilities, and so that's how you have the trust responsibilities flowing to enrolled members of tribes. Thank you. Justice Breyer? Good morning, thank you. Imagine you work for a company that sends people subscription requests. They keep information about subscriptions to vast numbers of publications, and I write back, you get this letter, and you're in charge of filling requests. Dear Mr. Cetra, I would like more information about any newspaper, including the Atlantic Monthly, which is published daily. Would you be at a loss as to how to fill that request? I'm sorry, Justice Breyer. It became muddled when you were giving me the example. The example is you get a letter from me or from somebody who says, please send me more information about any newspaper on your list, including the Atlantic Monthly, which is published daily. I'm just asking you if you'd have a problem giving me what I want. Is it you wouldn't know what I want? No, I think in that case you would. I think that's where you get into whether what Congress did here was absurd. No, no, it's not absurd. Is my question absurd? Do you have a problem? No, that's my point, is that your question is not. But when you apply that to the idea, and you say, would it be absurd here to do that? Yes, it would be absurd. I'm just asking you to have trouble filling my request, and I think your answer is no. Then you take it home, and you show it to your cousin, who is the world's greatest grammarian. And you say, see the kind of bad grammar I get? And he says, you're right to call that poor grammar, bad grammar, but not incorrect grammar. It's not good, but it's far from perfect. And I ask you that only because I've never heard of a canon that says you have to use perfect grammar, or even that you have to use good grammar when you are a member of Congress. What do you think? Right. Well, I would agree that it's not that we, and I'm sure the court knows this better than me, we don't expect Congress to use perfect grammar. If we did that in this case, we wouldn't have had a problem if they'd used perfect grammar. But what we do for the legal analysis is we start from the plain text, from what they wrote down. And what they wrote down is actually clear on the grammar. And then when we get to, should there be some reason that we don't apply the plain language here, we would be left with, well, it would have to be so bizarre that Congress could not have meant what it said. We know literally what it said. Thank you. Thank you. Justice Alito? Mr. Rasmussen, I suppose that the definition of Indian tribe in the CARES Act had never been used before. It had not been used in the ISDA. It had not been used in any prior statute. It was crafted by Congress and put in the CARES Act. And the CARES Act provides a one-time distribution of money. And at the time of the enactment of the CARES Act, no ANC had been recognized in the sense that you think is necessary. How, then, would you account for the reference to ANCs in the definition of an Indian tribe? Would you make the same argument, or would your argument have to be different? Well, we'd make the same argument, but still you'd have the clear language. You know, if you were dealing with something that is going to be a one-time statute, as we are here with the CARES Act, I think that does change the analysis some, but we would still be making the same argument. Well, how could you make the same argument? Because then the clause that refers to ANCs wouldn't be surplusage. It would be absurd. Yeah, I think that you could say, that's what I'm saying. I think that the standard they would have to meet here is absurd. Well, it would be absurd, would it not? Only if Congress knew all of that information. Congress didn't know it was making a one-time distribution of funds. Congress didn't know, or we should not presume that Congress was aware that no ANC had been recognized in the sense that you think is important? Again, I think that you're asking me what our argument would be, and our argument would still be the same. We would, though, have a much, much more difficult argument on absurdity in that context than we have now. You would not just have a more difficult argument on absurdity, you would have an impossible argument on absurdity, because you would have a clause that means nothing, that contradicts the meaning that you ascribe to this provision, right? Well, we would disagree on that, but I can understand where a court would come out with that decision, yes. Well, how do you disagree? You say that in order to be eligible for these funds, an entity has to be recognized in a certain sense. No ANC had been recognized in that sense at the time when Congress made this one-time distribution of funds, and yet Congress referred to ANCs in the definition of groups that are eligible for these funds. There's a blatant contradiction. Yes, I would agree. In that context, there is, and that's why I do think that, you know, again, I could imagine a court saying that is absurd. I wouldn't say that is absurd, because I think, again, the plain language and the complexity of this is sufficient, that if Congress wants to, you know, over-include and then use a qualifier at the end to eliminate things, that's how we often draft statutes. We don't go and do that research to find out whether there would be any possibility of an ANC qualifying. Congress wouldn't do that. Congress says any person over the age of 21 is eligible for something. However, nobody between the ages of 30 and 32 is eligible for this. Yes, contradictory provisions. Right. All right, let me come back to my example. Is there any reason why we should not analyze the CARES Act as if the definition of an Indian tribe had been created for that purpose instead of incorporating by reference a definition that was adopted at a different time? Do you see a difference between those two things? I see that the CARES Act itself then incorporates that requirement of recognition within itself. That's where our view is that instead of trying to make a broad decision and going on to all these other briefs that discuss all these extraneous issues, we should be looking at the CARES Act itself, which includes that concept of recognition. We all know what that concept of recognized Indian tribe means. You try to escape absurdity by saying that when the ISDA definition was adopted, there was a possibility that ANCs would be recognized in the relevant sense. At some point in the future, Congress might decide to recognize ANCs in that sense. But when you just look at the time when the CARES Act was adopted, we know that no ANC had been recognized in that sense. Correct. All right, thank you. Justice Sotomayor? Counsel, we do keep going around in a circle, and the circle starts with the fact that even the government recognizes, and you must too, that in 1974, the recognition clause could not have meant political recognition because that didn't exist at the time. It only existed in the 1990s. So 45 years ago, in 1974, is my math right? When ISDA was passed, there was no term of art that you were recognized as a government body. So now what you're arguing, I think, is that's clear today when the CARES Act was passed. But as Justice Alito just pointed out, then why would Congress have bothered to include ANCs in the CARES Act at all? Since after 45 years, it clearly knows now that no ANC has ever been politically recognized. Now I think the government's absurdity argument has more force. Because in 45 years, not a one, if we accept what the D.C. Circuit said, that in 1974, it was uncertain whether some would be recognized politically, it's clear now it's not going to be. So don't we have to accept Mr. Clement's argument that ISDA's language as used in the CARES Act cannot mean political recognition? No, because the CARES Act itself then incorporates that same concept of recognized governing body of an Indian tribe. And so that's where Congress did include that concept within the CARES Act itself. The concept is also within the ISDA. And we now know, I think, that no ANC is at fault. That's actually your strongest argument. And I'm going to hope that in its reply, the government will address that question, which is it may not be the case with some of ISDA's uses in other acts like the Housing Act and in other provisions of care, coronavirus care, where that governing body definition isn't included, that one could argue, take up the recognition argument that Mr. Clement has made more clearly. But perhaps then I'll stop now and let the government pick that up later. Justice Kagan. Mr. Rasmussen, you know, I agree with you that grammar is very important in understanding statutes and that grammar often allows us to choose between two possible meanings of a statute. But you have to have another possible meaning for grammar to serve that function. And the question is whether there really is another conceivable meaning here. So you said there is because Congress in the future could have recognized ANCs. Justice Alito said to you it had never done that in the past. But there's something even more than that which seems to make this an implausible understanding. Which is that, you know, putting aside whether it's theoretically plausible, I mean, ANCs are just different from the tribes that were recognized at the time. They are nonprofit corporations, excuse me, for-profit corporations, no historic bonds, members who aren't, you know, shareholders who aren't members of the tribe. Why should we even think that Congress had that in mind as a possibility at the time to make these federally recognized tribes? What we have actually is the ANCs themselves saying Congress could do this under its plenary power. Plenary power is very, very broad. Well, I'm not contesting Congress's legal authority to do it. I guess what I'm contesting is the idea that anybody at the time would have thought that Congress would do it. Well, there's certainly been efforts to have some of the ANCs federally recognized, at least a few of them, to have them federally recognized, that there has been that effort. So, you know, to date those haven't succeeded, but there's by no means certainty. I mean, suppose I thought that there was, you know, a 2% chance that Congress would ever do that. What should I do in interpreting this statute? Well, I think if we go to 1975, it was not that there was a 2% chance. But if we go to today, the whole point of including ANCs is so if that possibility comes around and they meet that definition, that they then are qualified. They come in basically on an equal footing to all the other tribes. That's why that is in there. Well, again, if we could just go back to 1975 and ask, was there really any realistic prospect that Congress would have included ANCs as federally recognized tribes? And if I say, you know, it's theoretically possible. Congress has the authority to do this. But if you went around and you polled Congress and you said, do you think of ANCs as federally recognized tribes? They would say, well, of course not. And say I thought that there was an extremely low probability that anybody thought that that was, you know, a possibility. Then wouldn't they just say, well, look, we can, you know, it's a theoretical possibility, but we can put it from our minds and we can say they wouldn't have included this clause about ANCs if they didn't mean to include this clause about ANCs? I think that the example that we use from the CARES Act itself, Congress does this in statutes. When it casts its net and then it includes the qualifier, it's letting the qualifier do that work for it instead of making those decisions. I mean, if Congress had not included ANCs in that particular act, then it would be saying, yeah, ANCs can never qualify. But it didn't do that. Instead, it gave that as the possibility if they would meet the qualifier. Thank you. Mr. Gorsuch? Mr. Rasmussen, first I'd like you to address a kind of a practical question. Your brief expressed concern that ruling for the ANCs would allow a sort of double dipping, that they'd be counted twice for purposes of the CARES Act. Mr. Clement responded to that concern this morning by suggesting that the federal government has lots of ways to administratively ensure that that doesn't occur. If that's right, it's hard to see what we're fighting about here. Can you explain your views? Well, what we know is that the United States has reserved, I think if I recall correctly from our brief, it's in a footnote in our brief and also in a footnote in Utah's brief. $530 million. About $71 million, if I recall correctly, was allocated to the population of ANCs. And to the extent ANCs have tribal members in them, that is, enrolled Indians in them, those enrolled Indians have already been counted. There's nothing in the record to explain how the United States came up with this large figure for the population of ANCs. But whatever it would be, would either be double counting or would be people who are not Indian, who are not enrolled Indians. Let me try my question again, though. Mr. Clement says there are administrative ways to deal with that problem and that therefore we're really fighting over nothing here. Why isn't that correct? Well, right now I would say it's not correct because when we're dealing with the CARES Act, the allocation has already been formulated. But more broadly, to the extent that, again, no matter where we are, to the extent that there are non-enrolled people of Indian descent, they are not Indians for federal Indian law purposes. And the Indians are the ones that are enrolled in the tribes in Alaska. People who are of Indian descent and can meet the enrollment criteria of any tribe in Alaska can become enrolled in the tribe in Alaska and establish that government-to-government relationship. Allow me to move to a different set of questions, if I might. The CARES Act speaks of tribal governments, and I asked Mr. Clement, is that an awkward fit with ANCs, for-profit corporations? And he suggested no, that it's entirely possible that Native tribes in the lower 48 could organize themselves in a similar fashion. What are your thoughts about that? Well, it is a very awkward construction, given that Title V is all about government, including tribal governments, including the recognized governing bodies of Indian tribes. So we've got this concept of government within that section repeatedly. The money, what we're dealing with here is really, and this goes back a little to your last question, what we're dealing with here is whether that money goes directly to the Indian tribes who then make the decision whether to provide it to, for example, ANCs who are doing services that benefit their members, or whether it goes to the ANCs directly, cutting out the tribes and eliminating their ability to make that decision. And so in the lower 48, that's exactly what's going on. The money went to the tribes. The tribes make the decisions. They can get it out to tribal organizations, similar to ANCs, if they want to, and if those ANCs were providing valuable services. There are a few of them that are, but what we've got here is a decision that every ANC qualifies, and every ANC is going to get at least $100,000, and some of them are going to get tens of millions. And just to return to a question that Justice Thomas posed, I'm not sure I got the answer to, if effectively this recognition clause asks us to inquire whether the tribes recognized, why didn't Congress just cross-reference the List Act? It could have. If Congress, you know, the fact that Congress doesn't change. But it didn't. It cross-referenced a different statute. What should that difference tell us? You're saying nothing. Isn't that awkward? No, I don't think it is at all, because I think we now have clarity of what that definition means. And so when we look at the other statutes where that is used, as we discussed, and as the National Congress of American Indians discusses it in depth in their brief, when that statute, that statutory definition is used, it's often very clear that it's excluding ANCs. So we do have some clarity on, you know, this is a statute that is regularly used when it does not include ANCs, because that's what it means now. Thank you. Justice Kavanaugh. Thank you, Chief Justice. Good morning, Mr. Rasmussen. I want to give you an opportunity to respond to how I think the two statutory arguments on the other side merge, potentially. So it seems to me if we start with the text, and we look at recognized as eligible, we have a choice. Do we read that in its ordinary meaning, as Mr. Clement says, or do we read it as a term of art? And that's a choice we have, and we have to figure out how do we resolve that. And one of the ways we usually resolve that is looking at the context to see how Congress might have been using the phrase here. And once we broaden out the lens and look at the context, we see the express inclusion of the ANCs, and we see that they would be left out completely, meaning many tens of thousands of Native Alaskans would be left out completely, not only from the CARES Act, but from many other social services statutes. So given that context, if that's correct, why doesn't that absurdity or oddity or whatever you want to call it, help influence the choice we have to make between whether to follow ordinary meaning or term of art meaning for the phrase recognized as eligible? Well, I think in the question you have bought into a couple of the incorrect statements made by the ANCs in this case. No Indian, no person who is a member of a federally recognized tribe was not already counted when the Treasury divided the money amongst the Indian tribes. So when they're referring to Indians, they're referring to people who are not enrolled in any Indian tribe. They don't have that political relationship with the United States. Those people are Alaska Natives, correct? They are Alaska Natives. And why are you treating Alaska Natives as kind of second class? We're not. Again, this is actually more common in the lower 48 states, that there are numerous people who are not members of tribes who are Indian, that they can be full-blood Indian even and still not be enrolled in a tribe, that that's not an uncommon thing. And that can happen in Alaska too. And if those people wanted to enroll in an Indian tribe and they met the qualifications for enrollment in an Indian tribe, they can do that. And then Congress apportioned this money to the governments, and the governments, so the Indian governments. Just to focus again on the question, we have a choice of how to use the phrase recognized as eligible. And when we figure out, do we go ordinary meaning or do we go term of art on that, it seems that the express inclusion of the ANCs, and given some of the points that have been made, no one thought that ANCs would ever be politically recognized now or then or in the future. Doesn't that help us choose ordinary meaning rather than term of art meaning here, so as to avoid that oddity, that absurdity, et cetera? Well, in the ISDEA, it doesn't just say recognized. It goes on to explain what that means. And then in 1993, the United States adopts the List Act and uses that same exact phrase to then say, these are the tribes that we're referring, these are the ANCs we're referring to. We're going to list them so that everybody knows. That was what that was designed to do, is provide that clarity for everybody, and that's what it does. And on the ratification argument, you said, well, that doesn't apply when there's a plain meaning. But I'm not sure we have a plain meaning, and your argument is really not plain meaning because you're relying on a term of art construction of recognized as eligible. We're only relying, I view it as certainly the interpretation of the ISDEA, you could use a plain meaning or a term of art meaning in order to get at this answer. What it's using is a term that later becomes the term that is used frequently and that Congress then has the United States define through the List Act and define the members that meet that qualification and meet that definition. Let me ask one other thing. The amicus briefs from Senators Murkowski and Sullivan and Congressman Young from the Alaska Federation of Natives, from the state of Alaska, from Cook Inlet, they use terms like stunning, egregious, destabilizing, staggering, in terms of the effects that an affirmance would have on this program, but also many other programs. Now, they know Alaska. They know how these statutes fit together. The members of Congress from Alaska are appropriately attentive to this. Why are they wrong in describing the consequences of choosing the term of art over ordinary meaning? Well, I think I would not question that they know Alaska, but I think they also are motivated by getting $533 million up into Alaska instead of mostly into the lower 48 states divided amongst all the tribes. So that's part of what they're doing. But when we look at the record in this case and the examples that they use, those are not accurate. For example, Siri, as the United States Fourth rightly admits, there are very many of these via contracts in Alaska. You get the exact opposite impression from all of the other briefs by their petitioners and their supporters. Thank you. Thank you. Justice Barrett? Mr. Osmundson, I want to be sure that I understand your position. You told Justice Thomas, and then I think you repeated it again to Justice Kavanaugh, that what it takes to establish a trust relationship between a Native Alaskan or a Native American from the lower 48 is enrollment in a tribe. Did I understand that correctly? The common way of doing it now is enrollment, that it would be enrolled or enrollable under almost every tribe. Okay, well then what do we make? I'm going to read you this language from ANCSA, and I'm wondering how to fit that in with your theory. It says, Alaska Natives shall remain eligible for all federal Indian programs on the same basis as other Native Americans, notwithstanding any other provision of law. I would take that to mean that because of Alaska's unusual, indeed very distinct method of handling benefits to Native Americans, that that amendment to ANCSA makes clear that that trust relationship exists even though they don't enroll in tribes. Am I wrong about that? Yes, I would say that that is incorrect. Even if you get to Commerce Clause issues, you simply can't go that far. I don't understand why. Okay, but in the ANCSA, what it is doing is saying on the same basis as others, and that same basis, as we all know now, is enrollment. So it's your position that Native Alaskans have no right to any benefits, even though they are automatically put in ANCSA if they don't enroll in Alaskan villages, you know, the equivalent of tribes. It's your position that despite this language in ANCSA, they're entitled to nothing from the federal government. No, it's not our position that they're entitled to nothing from the federal government. As Indians, not as Alaskan citizens or American citizens. I'm saying as Indians, it's your position that they are treated differently if they don't enroll in a village. No, that is not our position. Many of the programs that we're talking about, so, for instance, NAHASDA, the housing program, and many of these other programs. Mr. Ecklund, I think you're not understanding my question. You asserted broadly that the trust relationship between the United States and a Native person is established when that Native person enrolls in a tribe. And I took you to be saying that the United States doesn't have any kind of trust obligation to a Native person who is unenrolled, and you invoke the example of those who live in the lower 48 who have not affiliated with any tribe. Those strike me as different because Native Alaskans, it's not just a free-floating group that self-identifies, but are put into as shareholders in ANCSA if they choose not to enroll in a village. So I'm trying to understand how to reconcile what you said with this language in ANCSA, and you're referring to other statutes apart from ANCSA. What I'm referring to is that within the ANCSA, it is saying on the same basis as other tribes, and that then does bring in that concept of, well, if you want to have that relationship, you have to enroll in a tribe. There are 220 tribes up in Alaska, and you have to enroll in one of them. And it's your position that every Native Alaskan is eligible for membership in one of those tribes? That wasn't my understanding. I don't know whether they are or not. Whether they would be would be up to the tribes. So every Native Alaskan who is unaffiliated with a tribe that is a shareholder in an ANC isn't eligible for benefits as Indians. I mean, it's not just about what intermediary you receive those benefits through or whether you receive them directly from the BIA or another federal entity. You're saying that they are then no different than, say, any other citizen of Alaska that is not Native Alaskan. Well, I'm having trouble communicating this, but there are other programs that do extend more broadly than to enrolled members of tribes that include people, for example, NAHASDA, that includes people who are members of state-recognized tribes. And NAHASDA, I believe, includes some similar language that would incorporate. Let me just shift gears before my time expires, Mr. Rasmussen. Earlier in your argument, you were saying, characterizing this as somewhat of a dispute when Justice Gorsuch was asking you about double-counting, about who delivers the benefits, whether it's the villages or the ANCs. But isn't this really about whether the lower 48 are allocated more money? In other words, that the primary dispute here isn't about governance or who serves at the intermediary or the ANCs being able to trump how the villages might decide things, but what piece of the pie goes where. No, our view is that this is a fundamental question about tribal sovereignty and that the tribes are the sovereigns. Congress was giving the money to the sovereigns for them to make the decision. My time has expired. Thank you. Thank you. Mr. Rasmussen, we have a little bit of time left for any questions my colleagues may have that they didn't get a chance to get to, and I'll start us off. I want to follow up on the questions Justice Barrett and Justice Kavanaugh were asking because I thought that's what the case was really all about. In other words, there are Alaskan Natives who are not enrolled members of a village who receive significant services from ANCs, services that the availability of what is directly impacted by the COVID pandemic. And tens of thousands of people fit that description. And I understand you're doing what lawyers do, which is trying to get more money for your clients, but the enrolled members receive those benefits, and if you prevail, I gather, will receive more. But the Alaskan Natives who benefit from the services provided by the ANCs will get nothing. And I just wonder if that's what Congress, and maybe your plain language argument, maybe the answer is that, well, that doesn't matter, but I wonder if there's anybody in Congress who would think that Alaskan Natives receive significant benefits if they're enrolled in a tribe, but not if their benefits are provided through the ANCs. I did not understand Congress to be sort of pushing in favor of enrollment at the expense of participation by ANCs. There are significant programs that are of benefit to tribal members and others who are affiliated with the tribe. That money goes through tribes. Then how the tribes are permitted to spend that money, whether they can provide it to, for example, members of their community who are not enrolled or others is determined by the specific statutes at issue. There are a number of statutes that certainly permit them to do that. In this particular case, what we have, and I think that one fundamental problem that we have here is that the actual record in this case only shows three ISDEA contracts that are under a separate statute for cadastral surveys. The ANCs own the land, and so the cadastral survey, they have the authority to obtain that money. The only other one we have of record is CERI, and as we've talked about, that has a special statute. The parade of horribles that they provide of, oh, this is going to deprive people of money or services is simply false. Thank you, counsel. Thank you. Any of my other colleagues have remaining questions? Okay, we take a minute to wrap up. Mr. Rasmussen? Thank you, Your Honor. Again, our view is that the plain language is the touchstone. This court has said that repeatedly. The plain language is the touchstone for making these decisions. We don't go to ratification. We don't go to other doctrines when the language is plain. This sentence construction here is very clear, and therefore, the court below was correct when it said this is how this case should be decided. Thank you. Thank you, counsel. Mr. Guarnieri, rebuttal? Thank you, Mr. Chief Justice. I have just a couple of points to make. First, with respect to our primary argument, that is, the argument that if the recognition clause is understood to refer to formal political recognition, then it should not be read to apply to ANCs. I think really the pivot point for that argument, as the questions this morning have made clear, is whether you think there was any evidence of uncertainty about the status of ANCs when Congress enacted that language in 1975. Neither the court of appeals nor respondents have ever identified any evidence that Congress was at any time uncertain about the sovereign status of ANCs. And there's textual evidence in ISTA to that effect. I mean, the ISTA definition recites that ANCs were established pursuant to ANCSA. So it's entirely implausible to think that Congress itself was uncertain about the sovereignty or, I should say, lack of sovereignty about these corporations that Congress itself had established in a then-recent federal law. Certainly, there was no doubt about that point in 2020 when Congress enacted the CARES Act and incorporated into it the ISTA definition. And as I think Justice Alito's perceptive questions have pointed out, I mean, it makes no sense to think that the CARES Act incorporated for purposes of a one-time distribution of fines. The CARES Act incorporated a definition under which ANCs would be included only if, at some theoretical point in the future, Congress chooses to fundamentally reinvent the concept of recognition and recognize as eligible for government-to-government relations these private corporations. Now, the second point I want to address is the CARES Act language about the definition of a tribal government. The CARES Act defines a tribal government in terms that are almost word-for-word identical to the definition of a tribal organization in ISTA. And as the district court explained at pages 68A to 70A of the appendix, ANCs have long been understood to have a recognized governing body for ISTA purposes, and so, too, they have a recognized governing body for CARES Act purposes. And third, with respect to our alternative argument, I mean, Mr. Clement has ably addressed that argument. And I would just add that, you know, our point is simply that it's possible that different entities could demonstrate that they are recognized as eligible to participate in ISTA contracting in different ways. For the lower 48 states, the paradigm is acknowledgement by the federal government. But for ANCs, Congress has already deemed them to be eligible by including them in this special Alaska clause in the ISTA definition. And then, finally, on the practicalities, I mean, many thousands of Alaska Natives are not enrolled members of a federally recognized Indian tribe. And that's by design. And that's how Congress set it up in ANCSA. And a decision finding that ANCs are ineligible to receive these CARES Act funds and potentially ineligible to participate in the many other federal programs that rely on the same language as the ISTA definition would have serious, serious consequences for the delivery of federal services and benefits to Alaska Natives. It would disrupt the status quo that has prevailed for decades. And we ask this court to reject that interpretation and to reverse. Thank you. Thank you, counsel. The case is submitted.